## COMMONWEALTH, EX REL., v. J. G. WYMAN.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS
NO. 1 OF ALLEGHENY COUNTY.

Argued January 21, 1891—Decided January 26, 1891.*

[To be reported.]

1. The transition of a city from one class to another, under the provisions of the act of May 8, 1889, P. L. 133, works no change in its government, except such as the law makes necessary to adjust it to the class into which it goes; repeals no ordinances and vacates no offices except such as are abolished, and makes no vacancies to be filled except by the creation of new offices.

2. The persons, at the time of the transition, legally filling offices common to cities of each class, serve out the official terms for which they were elected, becoming possessed of all the powers and subject to all the duties pertaining to their offices in cities of the class to which the municipality has advanced; but their successors are to be elected under the laws regulating cities of that class.

(a) In 1890, Allegheny was a city of the third class, governed by the special act of March 31, 1870, P. L. 717, never having accepted the provisions of the act of May 23, 1874, P. L. 230. Her select council was composed of two members from each of her thirteen wards, elected under the act of May 23, 1881, P. L. 33, to serve for four years, the term of one member from each ward expiring in April, 1891, and that of the other in April, 1893:

3. The census of 1890 resulting in the advance of Allegheny to the second class of cities, in accordance with the act of May 8, 1889, P. L, 133, there is no need for an election of select councilmen in February, 1891; for, by expiration of terms in April, 1891, there would be left in office one member from each ward, the precise number to which cities of that class are entitled by the act of June 14, 1887, P. L. 395.

4. The provision in said act of June 14, 1887, that the members of the select council shall be divided into two classes, alternating in the expiration of their official terms, presents no difficulty in its application to a city having thirteen wards; it does not require the two classes to be equal, or, if so, an arrangement making a division as nearly equal as possible would be a substantial compliance with the law.

5. The title of the act of May 8, 1889, P. L. 133, viz.: " An Act dividing the cities of this state into three classes, . . . . and designating the mode of ascertaining and changing the classification thereof . . . . ." is sufficient to authorize the inclusion of a section designating when

---

* This case was heard by advancement in the Eastern District, and on account of its public interest the report of it is advanced.

Statement of Facts.

the new offices, created by a city's advance to a higher class, shall be filled by election, and when the official terms of officers, superseded by the change, shall cease.

6. As the councilmen in office in a city of the third class, at the time of its transition to the second class, continue to serve until the expiration of their respective terms, and constitute the city councils under the new government, it is their right and duty to elect the heads of the new executive departments, to which the city becomes entitled under § 4, act of June 14, 1887, P. L. 395: Per Mr. Chief Justice PAXSON.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 52 October Term 1891, Sup. Ct.; court below, No. 274 March Term 1891, C. P. No. 1.

On December 31, 1890, upon petition of Joseph Carson, a citizen and tax-payer of the city of Allegheny, the court below granted a rule upon James G. Wyman, mayor of said city, to show cause why a writ of mandamus should not issue against the respondent, commanding him to issue an official proclamation calling for the election of one member of select council from each of the wards of the city at the next municipal election. The respondent having answered the rule, denying that it was his duty to issue such proclamation, the relator demurred to the answer.

The pleadings exhibited the following facts:

Prior to 1890, the city of Allegheny was a city of the third class, never having accepted the provisions of the act of May 23, 1874, P. L. 230, dividing cities into three classes, but being governed by the special act of March 31, 1870, P. L. 717, entitled, " An Act to reduce the charter of the city of Allegheny and the several acts amendatory thereof into one act." By the act of 1870, the powers of the municipal government were vested in a mayor and select and common councils; and it was provided, inter alia, that the select council should consist of two members from each ward, chosen to serve for the term of two years each, and that it should be the duty of the mayor to give at least ten days' notice, by proclamation, of the time and places of holding municipal elections.

The act of May 23, 1881, P. L. 33, fixed the regular term of office of select councilmen in cities of the third class at four years, and provided for biennial elections, so that the official terms of one half the members of the select council should ex-

Statement of Facts.

pire every two years. From the time of its enactment, that statute was acted upon in the city of Allegheny, and select councilmen were elected for the term therein prescribed.

The act of June 14, 1887, P. L. 395, entitled, "An Act in relation to the government of cities of the second class," contains the following provisions:

"§ 1 . . . . On and after the first Monday of April, one thousand eight hundred and eighty-eight, the select council shall consist of one member from each ward, whose successor shall be elected as hereinafter provided; the common council shall consist of at least one member from each ward, and apportioned in the manner provided by existing legislation, and shall be elected for a term of two years.

"§ 2. On the third Tuesday of February, one thousand eight hundred and eighty-nine, the qualified voters of each ward shall elect one select councilman, who shall be a qualified voter of the ward, and the members of the select council shall, immediately after their organization, proceed by lot to divide themselves into two classes: The first class shall serve for one year, the second class shall serve for three years. On the third Tuesday of February, one thousand eight hundred and ninety, and every fourth year thereafter, the qualified voters in each ward, whose representative in select council belongs to the first class, shall elect a representative for said ward for the term of four years, and in the year one thousand eight hundred and ninety-two, and every fourth year thereafter, the qualified voters in each ward whose representative in select council belongs to the second class, shall elect a representative for four years."

The act of May 8, 1889, P. L. 133, entitled, "An Act dividing the cities of this state into three classes with respect to their population, and designating the mode of ascertaining and changing the classification thereof in accordance therewith," provided, in § 1, for a classification of cities differing from that ordained in the act of May 23, 1874, P. L. 230, but making the minimum population, requisite to entitle a city to belong to the second class, the same as under the act of 1874, viz., 100,000. Section 2 of the act of 1889, is as follows:

"§ 2. The classification of said cities, respectively, shall be ascertained and fixed by reference to their population according to the last preceding United States census, or any municipal

census taken later, and whenever it shall appear, by any such census, that any city of the second or third class has attained a population entitling it to an advance in classification as herein prescribed, it shall be the duty of the governor, under the great seal of the commonwealth, to certify the fact accordingly; which certificate shall be entered at large upon the minutes of the councils of such city and recorded in the office for the recording of deeds of the proper county. At the municipal election occurring not less than one month after the date of such certificate, the proper officers shall be elected to which the said city will become entitled under the change in classification, and upon the first Monday of April next succeeding thereto, the terms of all officers of said city then in office, whose offices are superseded by reason thereof, shall cease and determine, and the city government shall be duly organized and shall thereafter be controlled and regulated by the laws of this commonwealth, applicable to the same under the respective classification hereby fixed and appointed."

The United States census of 1890 disclosed the fact that Allegheny had a population of 105,287. On December 19, 1890, the governor, in pursuance of the provisions of § 2 of the act of 1889, issued a certificate declaring that fact.

The city of Allegheny contains thirteen wards, each of which has two representatives in the select council. Under the act of May 23, 1881, the term of one of the members from each ward would expire on the first Monday of April, 1891, and the terms of the remaining members would not expire until the first Monday of April, 1893.

The relator averred, in his petition, that the special act of March 31, 1870, which fixed the number of select councilmen at two from each ward, was not repealed by the act of June 14, 1887, and therefore it was the duty of the mayor to issue a proclamation for the election of one select councilman from each ward at the municipal election to be held on February 17, 1891; while the respondent maintained, in his answer, that by reason of its transition from the third to the second class, the number of select councilmen to which the city was entitled was reduced by the act of June 14, 1887, to one from each ward, and that, as there was already in office a representative in select council from each ward, elected for a term expiring

on the first Monday of April, 1893, there was no vacancy to be filled by an election to be held in February, 1891.

After argument, the court, SLAGLE, J., sustained the demurrer in an opinion in part as follows :

The first act of assembly classifying cities of this commonwealth was approved May 23, 1874, which divided cities into three classes ; first class to consist of those having over 300,000 inhabitants ; second, those having less than 300,000 and more than 100,000 ; third, those having less than 100,000 and more than 10,000. The act contained a complete system of government for cities of the third class, but provided " that the corporate powers, and the number, character, powers and duties of officers of cities of the first and second classes, and those of the third class now in existence by virtue of the laws of this commonwealth, shall be and remain as now provided by law, except where otherwise provided by this act."

At the time of the passage of this act, the city of Allegheny had the requisite population and under it became a city of the third class, but by the provision above cited was to be governed by the laws then in force unless it should avail itself of the provisions of the act in the mode prescribed by the fifty-seventh section. This the city never did, and consequently remained subject to the local laws relating to its government, except so far as they may have been repealed by subsequent legislation. It is perhaps not necessary to inquire what changes were made, but it appears by the petition that councils accepted and have acted under the act of May 23, 1881, fixing the terms of councilmen in cities of the third class. This act makes no material change, except that it makes the term of select councilmen four years, and provides for biennial elections. But it further appears by the petition and is admitted by the answer that the city has now become a city of the second class; and the question raised by the record is as to the effect of the transition upon the select council, and the corresponding duty as to the election of members of that body.

The act of 1874 is silent as to the mode of such transition and the changes effected thereby. It seems clear that in the absence of legislative provision, the number, character, power and duties of the officers of the city named remained unchanged.

Opinion of Court below.

This should follow from the clause of the act of 1874 above cited, and also by the general principles of law in such cases: Erie Academy v. Erie, 31 Pa. 516. We must then look for some law affecting the matter.

The only act upon the subject is that of May 8, 1889, P. L. 133, which provides: . . . . .

It is perfectly plain that under the provisions of this act, by virtue of its population of which the governor's certificate is evidence the city of Allegheny has become a city of the second class, to be fully organized as such upon the first Monday of April next. As members of select councils are officers of the city, it seems to be equally clear that at the next municipal election after the date of the governor's certificate, which is the third Tuesday of February, 1891, there should be an election for members of councils to which said city is entitled as a city of the second class, and that the terms of those select councilmen now in office shall cease and determine on the first Monday of April next succeeding. The words of the act are plain, and will not bear any other construction.

What members of select council are provided for cities of the second class? To ascertain this, we must look for a general law relating to such cities. The only provision we find for councils of cities of the second class is in the act of June 14, 1887, P. L. 395, the first section of which provides that select council shall consist of one member from each ward. The second section is as follows: . . . . . It is contended by plaintiff that this act is inapplicable, because it fixes elections in 1889 and 1890, which are now past, and its provisions are inappropriate to the present condition of Allegheny city, and therefore the laws heretofore governing the city remain in force. This objection does not seem to be well taken.

These are general laws relating to the same subject. Statutes in pari materia must be construed as one act. Statutes are to be so construed as best to effectuate the intention of the legislature, though such construction may seem contrary to the letter. Incongruities must be so construed as to harmonize the general intents of the whole act. . . . .

There would seem to be no difficulty in reconciling the acts of 1889 and 1887, by inserting the date fixed by the act of 1889, to wit, the third Tuesday of February, 1891, instead of

the impossible date of 1889; and, omitting the other impossible date of 1890 and substituting corresponding dates succeeding the third Tuesday of February, 1891, there will be a complete organization of councils in accordance with the plain intent of the legislature, and without doing violence to the language, especially in view of the fact that the act was intended as a general rule, and the dates only material for its first application. The main purpose of the act of 1887 was to fix the number of select councilmen and their terms of office, to divide them into two classes, and provide for the election of successors upon the expiration of their respective terms. Incidental to this was designating the time for holding the first elections in cities of the second class then existing, which was in its nature temporary. The act of 1889 fixes the terms of holding the first election in cities subsequently coming into that class, and reference must be made to the act of 1887 for their terms. The terms are material, the dates immaterial.

It follows then that an election should be held in each ward of the city of Allegheny, for one member of select council on the third Tuesday of February, 1891, to be divided into two classes; one to serve one year from the first Monday of April, 1891, and the other for three years; and upon the expiration of those terms, successors shall be elected for four years respectively; and it is the duty of the mayor to issue his proclamation for such election.

The counsel for defendant contends that there is no necessity for an election, because there is now in office one member from each ward, who should continue in office until the expiration of their terms in 1893. Such construction is not in accordance with the letter or spirit of the law. If an election is postponed until 1893, the difficulties in applying the law would be greater than now. The law plainly requires an election, the next election after the governor's certificate, and just as plainly provides that the terms of those persons then in office shall cease on the first Monday of April following.

The demurrer is sustained, and a mandamus will be issued for an election proclamation, in accordance with the opinion, under the act of 1889.

—Thereupon, the defendant took this appeal, specifying that the court erred:

1. In entering judgment on the demurrer in favor of the commonwealth, and directing the mandamus prayed for.

2. In not entering judgment on the demurrer in favor of the defendant.

*Mr. D. T. Watson* and *Mr. P. C. Knox* (with them *Mr. James H. Reed*), for the appellant:

1. As Allegheny city has not accepted the provisions of the classification act of May 23, 1874, P. L. 230, and its supplement of April 11, 1876, P. L. 20, it never became subject to them: Henry St., 123 Pa. 355; but has continued to be governed by its special charter contained in the act of March 31, 1870, P. L. 717, amended by the act of May 23, 1881, P. L. 33, which it accepted, so far as to lengthen the term of its select councilmen from two to four years. The fact that the state saw fit to classify cities according to population, did not in the least affect its character as a body corporate. Whether you call it a city of the third class, or a city of the second class, it remains the same municipal corporation which the act of 1870 created. The mere classification changed none of its powers, took away none of its offices or officers, and affected it in no respect whatsoever.

2. A change in the form of government, such as from a borough to a city, does not, ipso facto, abrogate the existing laws, written or unwritten, nor change the officers of the municipality, except in so far as the legislature has manifested a plain intent to alter such laws, or to dispense with such officers: Erie Academy v. Erie, 31 Pa. 516; Allegheny Co. v. Gibson, 90 Pa. 397. A fortiori, the principle we contend for applies, when the change is the mere passing from one class of cities to another in consequence of increase in population: 1 Dillon on Mun. Corp., §§ 171, 172; Girard v. Philadelphia, 7 Wall. 1; State v. White, 20 Neb. 37. The question, then, is whether the legislation respecting cities of the second class, either expressly or by necessary implication, plainly apparent upon its face, cuts short the terms of the select councilmen elected in Allegheny under the charter of 1870, which do not expire till 1893.

3. The only legislation the effect of which need be considered, is contained in the acts of June 14, 1887, P. L. 395, and

Arguments.

May 8, 1889, P. L. 133. The essential change produced upon the charter of 1870 by the act of 1887, is that the membership of the select council from each ward is reduced to one. The legislative intent, in passing the act of 1887, was not to legislate out of office any select councilman elected for the city prior to its becoming a city of the second class, but the intent is plain that such select councilmen should serve out their terms of office, and that no persons should be elected to select council, except as successors of the select councilmen of the old city. The new members to be elected are to succeed, not to supersede, the old members. The judgment of the court below is therefore manifestly erroneous, unless the act of 1889 makes some change in the act of 1887, and shows plainly an intent to strike down the terms created under the acts of 1870 and 1881.

4. The act of 1889 did not intend to do this; on the contrary, it provides for the cutting short of the terms of those officers, only, whose offices are superseded by the change in classification. The office of select councilman is not superseded, but is preserved as heretofore. The contention of the relator that an election should be held in February, 1891, under the charter of 1870, is sufficiently met in the opinion of the court below. The dates named in the act of 1887 are directory merely, and were intended to enable cities of the second class, then existing, which were to come under its provisions, to do so with as little inconvenience as possible. So, the fact that thirteen councilmen cannot be evenly divided by two, is unimportant. The act of 1887 does not require an equal division. If it be true that the dates in the act show a plain intent to apply it to the existing state of facts in the then only city of the second class, the city of Pittsburgh, this would not make the act, otherwise constitutional, local or special legislation.

5. The decree should be reversed because it compels an election to be held under the provisions of the act of May 8, 1889, P. L. 133, which, in so far as it provides for the election of municipal officers, is unconstitutional. The title of the act indicates but one subject, classification and the change thereof, and contains nothing indicating an intention to deal with the subject of municipal elections, or to strike down the terms of municipal officers. As has been abundantly shown, the mere

fact of change from one class to another does not involve a change in government, and or in the number, powers and duties of officers, or in their terms of office. Therefore, legislation, in an act bearing such a title as this one, which undertakes to provide for elections and changes in offices, cannot be sustained on the theory that it is germane to the subject expressed in the title. The title must give information as to the legislation contained in the act: Union Ry. Co.'s App., 81* Pa. 91; Dorsey's App., 72 Pa. 192; Commonwealth v. Frantz, 135 Pa. 389.

*Mr. George Elphinstone*, for the appellee :

1. The act of May 8, 1889, P. L. 133, divides cities into three classes materially differing in character from the classes created by the act of May 23, 1874, P. L. 230, and Allegheny, by becoming a member of the division styled the second class, in the act of 1889, does not become subject to the legislation enacted for the former class of the same name. Its special laws remain unrepealed and unaffected by its change in class, until altered by legislation for the new second class. These conclusions appear to be authorized by a fair reading of the act of 1889. It nowhere shows an intention to subject cities coming into the second class, thereby created, to the laws provided for the old second class. We claim, however, that the act of 1889 is unconstitutional, in that it contains more than one subject of legislation. In addition to what is declared by its title, it attempts to enact a transition bill, abolishing offices, unseating officers duly elected, and providing for the election of new officers. The case comes clearly within the ruling in Hatfield v. Commonwealth, 120 Pa. 395, and Commonwealth v. Frantz, 135 Pa. 389.

2. If the act of June 14, 1887, P. L. 395, is in force in Allegheny, it does not repeal the provisions of the special charter of 1870, respecting the select council. It is impossible for us to comply with its provisions. The directions as to the holding of elections in 1889 and 1890, are mandatory, but they are impossible of performance in Allegheny. Nor is it possible to divide the thirteen select councilmen, to which, under the act of 1887, the city would be entitled, into two equal classes alternating in terms. The intent of the legislature as to biennial

expiration of terms is so linked to the provision as to number, that it cannot be dissevered therefrom without violence to the law, and, if councils can fix the number of each of the classes to suit themselves, the purpose of the law would be perverted. The plain intention of the legislature was that the two classes should be equal in number. If the city has the power to make seven long, and six short terms, it would have the power to make twelve long terms and one short term. No provision is made for a city having an uneven number of wards. When it is impossible to comply with certain provisions of an act, these provisions are inoperative and void.

3. Again; the mischief sought to be remedied by the act of 1887 was a disproportion between the two branches of councils, the select council being by far the larger body in the only existing city of the second class, and the purpose of the act being to cut it down one half. The application of the law to Allegheny would have a result directly opposite, and bring about a disproportion in the other direction. We would have but thirteen select councilmen and fifty-eight common councilmen. Nor can this difficulty be cured by a division of wards under the act of May 23, 1874, as that act requires the submission of such a question to a popular vote. To carry out the legislative intention to secure a proper proportion between the two bodies of councils, would it not be fair to assume that there was no purpose to repeal the local law, as to select council, of any city coming into the second class with a small and odd number of wards? Such a saving of local laws would not invalidate the general act: Evans v. Phillipi, 117 Pa. 226; Malloy v. Reinhard, 115 Pa. 25. But we claim, further, that the act of 1887 cannot repeal the charter of 1870, because the entire act is unconstitutional.

4. The act of 1887 is in violation of the constitutional prohibition of local legislation for cities. It is true that legislation for a class composed of but one city, has been justified on the ground that other cities, by increase of population, may come into that class and become subject to such legislation. But this assumption cannot save the act in question, for two reasons: (a) On its face, it is inapplicable to any city coming into the second class after its enactment, as it specifies the dates at which certain things shall be done; and (b) at the

Opinion of the Court.

time of its enactment there was no possibility of any other city becoming a member of the second class, there being no provision in the act of May 23, 1874, P. L. 230, for a change of class, and that act having arbitrarily and finally fixed the rank of each city, with the expectation that the ratio of increase in all the classes would be substantially uniform, and that the various cities would always bear the same relation to each other that existed in 1874. The legislature had no right to assume that one or more third class cities would be ushered into the second class by some subsequent legislature.

5. Legislation for a class composed of but one city can be justified only on the theory that some existing city will probably come into that class by increase of population. The idea of the word class is apparent from its derivation: classis, a fleet, a troop, a collection, a cluster. One city can no more constitute a class, than one ship can make a fleet, one soldier a troop, one object a collection, or one grape a cluster.* As this act is limited by its plain terms to the only city of the second class existing when it was passed, and as there was then no possibility of any other city coming into that class except by a future act of the legislature, it is a local law obnoxious to the constitution. If by the act of 1889 Allegheny is forced into the second class, and thereby becomes subject to all the legislation enacted for cities of that class, as constituted by the act of 1874, untold disorder and uncertainty will pervade every departure of the government. A judgment that the new second class is not the old, and that Allegheny is not bound by the laws enacted for the former second class, will remove all difficulty. If this is impossible, a decision that the local law of 1870, as to select council, is unrepealed by the act of 1887, will relieve from considerable embarrassment.

OPINION, Mr. CHIEF JUSTICE PAXSON:

It has been ascertained, in the manner required by law, that the city of Allegheny has now a population which entitles it, under the classification acts of 1874 and 1889, to become a city of the second class. Prior to the last census it was a city of the third class. It now passes from the one class to the other, by

---

* But see Wheeler v. Philadelphia, 77 Pa., at p. 350, top.—REP.

reason of its growth in population, without shock or disturbance. It is the first event of the kind in the political history of the state, and is not without interest.

It is conceded that up to the present time the city of Allegheny has been governed by the special act of March 31, 1870, P. L. 717, entitled "An Act to reduce the charter of the city of Allegheny, and the several acts amendatory thereof, into one act." By that act, the powers of the municipal government were vested in the mayor and select and common councils. The select council was composed of two members from each ward, to serve for a term of two years, which term was increased by the act of 1881 to four years. There being thirteen wards in the city, the number of select councilmen has hitherto been twenty-six.

It is also conceded that the city of Allegheny, while it has been a city of the third class, under the classification acts aforesaid, has never accepted the provisions of the general city laws of 1874, and hence, as was decided in Henry Street, 123 Pa. 347, was not governed by their provisions, but remained subject to the said special act of 1870.

The transition from the one class to the other works no change in its government except such as the law makes necessary to adjust it to the class into which it goes. It repeals no ordinances; it vacates no offices except those which it abolishes, and makes no vacancies to be filled except by the creation of new offices. The offices of mayor, and of select and common councils are common to each class of cities. The mere fact of the transition does not necessarily unseat the persons legally filling such offices at the time it occurs, but they serve out their official terms for which they were elected, and their successors are elected under the laws regulating the class into which the city has moved. In the meantime, the officers, whose terms have not expired, become possessed of all the powers and are subject to all the duties pertaining to the offices held by them in cities of the class to which it has advanced. In other words, the machinery of the old government is to be used in adjusting the city to its position under the new. Were it otherwise,—were all offices to be suddenly vacated, we would have chaos. We would have a city without a mayor; without councils; without heads of departments; without police officers to preserve the

public peace, and no one authorized to set in motion the machinery by which the new government can be organized.

The precise question for our determination, in this case, is whether it is the duty of the respondent, as mayor of the city, to issue his official proclamation, ordering the election, at the next municipal election, of one member of select council from each ward in the city. The court below was of opinion that such election was necessary, and awarded a mandamus ordering the mayor to issue his proclamation therefor. From this decision the mayor appealed.

To the petition for the mandamus the mayor makes answer, inter alia, "That each of the wards of said city has now a representative in select council whose term does not expire until the first Monday of April, 1893, and that there is therefore no vacancy in select council to be filled by the election to be held on the third Tuesday in February, 1891. He is further advised that the offices of said members of select council are not superseded by reason of the said city's change in class."

It was contended on behalf of the relator that the last portion of § 2 of the act of May 8, 1889, P. L. 133, entitled "An Act dividing the cities of this state into three classes with respect to their population, and designating the mode of ascertaining and changing the classification thereof in accordance therewith," requires the election of thirteen select councilmen at the approaching municipal election. The portion of said act referred to is as follows:

"At the municipal election, occurring not less than one month after the date of such certificate, the proper officers shall be elected to which the said city will become entitled under the change in classification, and upon the first Monday of April next succeeding thereto, the terms of all officers of said city then in office, whose offices are superseded by reason thereof, shall cease and determine, and the city government shall be duly organized, and shall thereafter be controlled and regulated by the laws of this commonwealth, applicable to the same under the respective classification hereby fixed and appointed."

Our construction of this language is as follows:

(*a*) The proper officers to which the city will become entitled, under the change in classification, are for those offices created by the law for cities of the second class, and which did not exist

Opinion of the Court.

in cities of the third class; in other words, those offices which are required to be filled for the first time by the city of Allegheny.

(b) Those officers whose terms are required to cease and determine upon the first Monday of April next are those whose offices are superseded, i. e., abolished, by the laws regulating cities of the second class. The term ceases, because the office itself is abolished.

We regard this as the plain meaning of the act. The office of select councilman is not superseded; it remains under the new, precisely as it existed under the old government, subject only to a reduction in the number of members. The select council is now composed, as before observed, of twenty-six members, the terms of office of one half of whom, as I understand, will expire this spring. This leaves thirteen members, the precise number to which the city is entitled under the new order of things, whose terms will not expire until April, 1893. There is, therefore, no necessity for an election this year of such members. All the present members are entitled to retain their seats until the expiration of their respective terms. In this way, without jar or friction, the old order of things will pass away, and the city quietly take its place among the cities of the second class.

It was urged, however, that a difficulty may arise under the second section of the act of June 14, 1887, P. L. 395, which provides for the division of select council into classes, and that, inasmuch as there are only thirteen members, they cannot be divided into two even classes. It might be sufficient to say that the act does not require the classes to be even, but, aside from this, no difficulty is apparent in dividing them by the members of the wards, thus : the members from the even wards to form one class, the members of the odd wards to form the other. It is true, this would compose one class of seven and the other of six. There would, however, be two distinct classes, as evenly divided as the circumstances will permit; and such an arrangement would be a substantial compliance with the law. And, if even classes be desired, an additional ward could, and in the course of time may be created as a public necessity. Aside from this, I am unable to see how the election of thirteen members of select council at the ensuing spring election

Opinion of the Court.

could remedy this objection, or meet this difficulty. Thirteen will divide by two as evenly now as then.

In order that we may not be thought to have overlooked the point, I desire to say that we are not unmindful of the fact that the act of 1889 was claimed to be unconstitutional. We are of opinion that the title sufficiently indicates the object of the act, and that its provisions are germane to such object. A discussion of this point is not considered necessary.

We are asked to express an opinion upon a further question not directly involved in this controversy. While averse to doing so in ordinary cases, we think the circumstances justify us in doing so in this instance, especially as both parties to this contention unite in this request.

The fourth section of the act of 1887 provides as to cities of the second class as follows:

" There shall be the following executive departments, the heads of which shall be chosen by city councils :

I. Department of Public Safety.

II. Department of Public Works.

III. Department of Charities."

We are asked to say whether these respective officers shall be elected by the councils of the new or the old city. Upon this point we are in no doubt. The present councils are the councils of the new city, if I may use a term which does not quite accurately describe the situation. The city remains the same. It merely passes from one condition to another. It enters the new with all its ordinances; all its officers whose offices have not been abolished; all of its contracts in full force, and simply conforms for the future to the new regulations which the law declares shall supersede the old. The machinery of the latter, as before observed, must be used to start the city under its new government.

We are of opinion that the present councils should proceed to elect the heads of departments.

> The judgment is reversed, and judgment is now entered for the respondent upon the demurrer.